**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ANDREW MCCORMICK,** | : | |
| **Plaintiff** | : | **No. 1:25-cv-00380** |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | |
| **COMMONWEALTH OF PA DOC, et al.,** | : | |
| **Defendants** | : | |

**MEMORANDUM**

Currently before the Court are pro se Plaintiff Andrew McCormick ("McCormick")'s application for leave to proceed in forma pauperis ("IFP Application"), complaint, and motion to appoint counsel.  For the reasons stated below, the Court will grant the IFP Application, deny without prejudice the motion to appoint counsel, dismiss all but one claim in the complaint, and grant McCormick leave to file an amended complaint as to all but one of his claims.

## I.    BACKGROUND

McCormick, a convicted and sentenced state prisoner, commenced this action by filing his complaint, IFP Application, and certified prisoner trust fund account statement, all of which the Clerk of Court docketed on March 3, 2025.  (Doc. Nos. 1–3.)[1]  On March 20, 2025, McCormick filed a motion to appoint counsel.

In his complaint, McCormick names as Defendants: (1) the Commonwealth of Pennsylvania Department of Corrections ("DOC"); (2) Pennsylvania State Correctional Institution Huntingdon ("SCI Huntingdon") Correctional Officers Burton ("CO Burton") and Renninger ("CO Renninger"); (3) SCI Huntingdon Lt. Fochtman ("Lt. Fochtman"); and (4) SCI Huntingdon Superintendent Rivello ("Rivello").  See (Doc. No. at 1 at 1–3.)  McCormick alleges

---

[1]  Approximately two weeks later, McCormick filed a second application for leave to proceed in forma pauperis.  (Doc. No. 8.)  The Court will deny this second application as moot.

that while he was incarcerated at SCI Huntingdon on June 27, 2023, he asked CO Burton for

help because McCormick was feeling suicidal.  See (id. at 4).  CO Burton told McCormick that a

lieutenant would stop by to see him; however, after a half hour no one came to talk to him.  See

(id.).  Burton then covered his door to get a lieutenant's attention.  See (id.).  Thereafter,

although correctional officers kept walking by his cell during their security rounds, no one

stopped by his door.  See (id.).

At 8:20 p.m., COs Burton and Renninger stopped at his door.  See (id.)  At the time,

McCormick was "unresponsive and feeling suicidal."  See (id.).  COs Burton and Renninger

banged on McCormick's cell door twice, and CO Burton said, "I been [sic] waiting to OC spray

you since you threaten [sic] Mis [sic] Cousins."  See (id.).  CO Burton then opened the food slot

on the door and sprayed McCormick with OC spray, "which was not a [sic] issue."  See (id.).

McCormick was moved to an "observation camera cell."  See (id.).  When he got to the

cell and his handcuffs were being removed, CO Burton told McCormick to kill himself.  See

(id.).  McCormick "took notice" of a three-foot long noose lying at the top of his concrete bed.

See (id.).  McCormick tried to "get there [sic] attention," by holding up the noose towards the

camera, but no one came to his cell to remove it.  See (id. at 5).  McCormick believes that the

noose was left in the cell so he could kill himself.  See (id. at 4–5).  So, he "put [the noose]

around [his] neck and hung [himself] off the cell door."  See (id. at 4).  An "Officer" later

"found" McCormick, took him down and began "beathen [sic]"[2] him.  See (id.).

Thereafter, "[t]he Lt. said that his officers did what they was [sic] suppose [sic] to do."

See (id. at 5).  McCormick also talked to Rivello, who told him that the officers did their job.

---

[2]  It is unclear whether McCormick alleges that this officer beat him or attempted to resuscitate
him.

See (id.).  McCormick asserts that "this is not true because the observation camera suppose [sic] to been [sic] check [b]efore I was placed in there[, and t]he noose was placed in their [sic] for [him] to harm [himself]."  See (id.).

McCormick also alleges that the "DOC conspired together by not allowing [him] to exhaust [his] administrative remedies by transferring [him] to 6 differ [sic] prisons."  See (id.).  He states that he "keep[s] trying to refile the grievance[, but] they are using the 803 policy[,] which is the mail policy[,] to get over on this partly [sic]."  See (id.).  Rivello told McCormick that he "was going to be sick of how many prisons [he] end [sic] up in."  See (id.).

Based on these allegations, McCormick asserts claims under 42 U.S.C. § 1983 for (1) failure to protect in violation of the Eighth Amendment to the United States Constitution, (2) excessive use of force in violation of the Eighth Amendment, (3) retaliation in violation of the First Amendment, (4) solicitation of suicide/vulnerability to suicide in violation of the Eighth Amendment, and (5) due process violations under the Fourteenth Amendment.  See (id. at 6).  He states that he suffered a "slip disk [sic] in [his] neck" and post-traumatic stress disorder due to Defendants' conduct.  See (id.).  For relief, McCormick seeks at least $250,000.  See (id.).

## II.   LEGAL STANDARDS

### A.   Applications for Leave to Proceed in Forma Pauperis

Under 28 U.S.C. § 1915(a)(1), the Court may allow a plaintiff to commence a civil case "without prepayment of fees or security therefor," if the plaintiff "submits an affidavit that includes a statement of all assets such prisoner possesses that the person is unable to pay such fees or give security therefor."  See id.  This statute

> "is designed to ensure that indigent litigants have meaningful access to the federal courts."  Neitzke v. Williams, 490 U.S. 319, 324, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).  Specifically, Congress enacted the statute to ensure that administrative court costs and filing fees, both of which must be paid by everyone else who files

a lawsuit, would not prevent indigent persons from pursuing meaningful litigation. [Deutsch v. United States, 67 F.3d 1080, 1084 (3d Cir. 1995)].  Toward this end, § 1915(a) allows a litigant to commence a civil or criminal action in federal court in forma pauperis by filing in good faith an affidavit stating, among other things, that [they are] unable to pay the costs of the lawsuit.  Neitzke, 490 U.S. at 324, 109 S.Ct. 1827.

See Douris v. Middletown Twp., 293 F. App'x 130, 131–32 (3d Cir. 2008) (unpublished)

(footnote omitted).

### B.    The Court's Screening of Complaints Under 28 U.S.C. §§ 1915A and 1915(e)(2)

Under 28 U.S.C. § 1915A, this Court must "review . . . a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity."  See 28 U.S.C. § 1915A(a).  If a complaint is frivolous or fails to state a claim upon which relief may be granted, the Court must dismiss the complaint.  See id. § 1915A(b)(1).  The Court has a similar screening obligation with respect to actions filed by prisoners proceeding in forma pauperis.  See id. § 1915(e)(2)(B)(ii) ("[T]he [C]ourt shall dismiss the case at any time if the [C]ourt determines that . . . the action or appeal . . . is frivolous . . . [or] fails to state a claim on which relief may be granted . . . .").

A complaint is frivolous under Sections 1915A(b)(1) and 1915(e)(2)(B)(i) if it "lacks an arguable basis either in law or fact."  See Neitzke, 490 U.S. at 325.  In addition, when reviewing whether a plaintiff has failed to state a claim upon which relief may be granted under Sections 1915A(b) or 1915(e)(2), the Court applies the standard governing motions to dismiss filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  See, e.g., Smithson v. Koons, No. 15-cv-01757, 2017 WL 3016165, at *3 (M.D. Pa. June 26, 2017) ("The legal standard for dismissing a complaint for failure to state a claim under § 1915A(b)(1) [and] § 1915(e)(2)(B)(ii) . . . is the same as that for dismissing a complaint pursuant to Rule 12(b)(6) of the Federal Rules

of Civil Procedure."), report and recommendation adopted, 2017 WL 3008559 (M.D. Pa. July

14, 2017); Mitchell v. Dodrill, 696 F. Supp. 2d 454, 471 (M.D. Pa. 2010) (explaining that when

reviewing a complaint for possible dismissal pursuant to § 1915A, "a court employs the motion

to dismiss standard set forth under Federal Rule of Civil Procedure 12(b)(6)").  To avoid

dismissal under Rule 12(b)(6), a plaintiff must set out "sufficient factual matter" in the complaint

to show that their claims are facially plausible.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

This plausibility standard requires more than a mere possibility that the defendant is liable for the

alleged misconduct.  "[W]here the well-pleaded facts do not permit the court to infer more than

the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that

the pleader is entitled to relief.'"  Iqbal, 556 U.S. at 679 (citing Fed. R. Civ. P. 8(a)(2)).  When

evaluating the plausibility of a complaint, the Court accepts as true all factual allegations and all

reasonable inferences that can be drawn from those allegations, viewed in the light most

favorable to the plaintiff.  See id.; In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 314 (3d

Cir. 2010).  However, the Court must not accept legal conclusions as true, and "a formulaic

recitation of the elements of a cause of action" will not survive a district court's screening of a

complaint under Sections 1915A and 1915(e)(2).  See Bell Atl. Corp. v. Twombly, 550 U.S. 544,

555–56 (2007).

    In addition, in the specific context of pro se prisoner litigation, the Court must be mindful

that a document filed pro se is "to be liberally construed."  See Estelle v. Gamble, 429 U.S. 97,

106 (1976); Higgs v. Att'y Gen., 655 F.3d 333, 339–40 (3d Cir. 2011) (explaining that "when

presented with a pro se litigant, we have a special obligation to construe his complaint liberally"

(citation and internal quotation marks omitted)).  Therefore, a pro se complaint, "however

inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by

lawyers."  See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (internal quotation marks omitted) (quoting Estelle, 429 U.S. at 106).  This means the court must "remain flexible, especially 'when dealing with imprisoned pro se litigants . . . .'"  See Vogt v. Wetzel, 8 F.4th 182, 185 (3d Cir. 2021) (quoting Mala v. Crown Bay Marina, Inc., 704 F.3d 239, 244–45 (3d Cir. 2013))).

Additionally, when construing a pro se complaint, the court will "apply the relevant legal principle even when the complaint has failed to name it."  See Mala, 704 F.3d at 244.  However, pro se litigants "'cannot flout procedural rules—they must abide by the same rules that apply to all other litigants.'"  See Vogt, 8 F.4th at 185 (quoting Mala, 704 F.3d at 245).

### C.    Section 1983

Section 1983 is the statutory vehicle by which private citizens may seek redress for violations of federal constitutional rights committed by state officials.  See 42 U.S.C. § 1983. This statute states, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

See id.  "Section 1983 is not a source of substantive rights," but is merely a means through which "to vindicate violations of federal law committed by state actors."  See Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004) (quoting Gonzaga Univ. v. Doe, 536 U.S. 273, 284–85 (2002)).  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  West v. Atkins, 487 U.S. 42, 48 (1988).

## III.     DISCUSSION

### A.     The IFP Application

After reviewing the IFP Application and McCormick's certified prisoner trust fund account statement, it appears that he is unable to pre-pay the costs of this civil action.  Therefore, the Court will grant the IFP Application and allow him to proceed in forma pauperis in this case.[3]

### B.     Screening of the Complaint

#### 1.     Section 1983 Claims Against the DOC

Although McCormick names the DOC as a Defendant in his complaint, he does not specify which of his Section 1983 claims he asserts against the DOC.  Nevertheless, no matter which Section 1983 claim he attempts to assert against the DOC for money damages, he cannot maintain it here because the DOC is entitled to Eleventh Amendment immunity.

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." See U.S. Const. amend. XI.  This Amendment

> has been interpreted to render states—and, by extension, state agencies and departments and officials when the state is the real party in interest—generally immune from suit by private parties in federal court.  Indeed, it has been recognized for over two hundred years that a state's immunity from suit in federal court is a fundamental principle of our constitutional structure that preserves, as intended by

---

[3]  However, because McCormick is a prisoner, he is advised that he will be obligated to pay the filing fees for this case in installments in accordance with the Prison Litigation Reform Act ("PLRA"), regardless of the outcome.  See 28 U.S.C. § 1915(b).

the Framers, the respect and dignity of the states and protects the ability of the states
"to govern in accordance with the will of their citizens."

See Pa. Fed'n of Sportsmen's Clubs, Inc. v. Hess, 297 F.3d 310, 323 (3d Cir. 2002) (quoting

Alden v. Maine, 527 U.S. 706, 751 (1999)).

"Because the [DOC] is a part of the executive department of the Commonwealth, see [71

P.S. § 61], it shares in the Commonwealth's Eleventh Amendment immunity." Lavia v. Pa.

Dep't of Corr., 224 F.3d 190, 195 (3d Cir. 2000). However, the DOC's Eleventh Amendment

immunity "may be lost in one of two ways: (1) if the Commonwealth waived its immunity; or (2)

Congress abrogated the States' immunity pursuant to a valid exercise of its power." See id.

(citing College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 670

(1999) and Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 240–41 (1985)). As for the latter

exception, Congress did not intend to abrogate Eleventh Amendment immunity by enacting

Section 1983. See Quern v. Jordan, 440 U.S. 332, 344–45 (1979) (stating that "§ 1983 does not

explicitly and by clear language indicate on its face an intent to sweep away the immunity of the

States; nor does it have a history which focuses directly on the question of state liability and

which shows that Congress considered and firmly decided to abrogate the Eleventh Amendment

immunity of the States"). Concerning the former exception, the Commonwealth of Pennsylvania

has not waived its Eleventh Amendment immunity from suit in federal courts. See 42 Pa. C.S. §

8521(b) ("Nothing contained in this subchapter shall be construed to waive the immunity of the

Commonwealth from suit in Federal courts guaranteed by the Eleventh Amendment to the

Constitution of the United States."); see also Lavia, 224 F.3d at 195 (explaining that

Pennsylvania has not waived its Eleventh Amendment immunity). Therefore, neither exception

to Eleventh Amendment immunity applies here, and the Court will dismiss McCormick's

Section 1983 claims against the DOC.

### 2.      Section 1983 Fourteenth Amendment Due-Process Claims

McCormick asserts that Defendants violated his due process rights under the Fourteenth Amendment.  The Fourteenth Amendment of the United States Constitution provides in pertinent part that: "No State shall . . . deprive any person of life, liberty, or property, without due process of law."  See U.S. Cons. amend. XIV, § 1.  "The core concept of due process is protection against arbitrary government action [and, a]s that concept has developed, it has come to have both substantive and procedural components."  Evans v. Sec'y Pa. Dep't of Corr., 645 F.3d 650, 658 (3d Cir. 2011) (citing County of Sacramento v. Lewis, 523 U.S. 833, 845 (1998)).  The substantive component "limits what government may do regardless of the fairness of procedures that it employs," see Boyanowski v. Cap. Area Intermediate Unit, 215 F.3d 396, 399 (3d Cir. 2000), whereas the procedural component "governs the manner in which the government may infringe upon an individual's life, liberty, or property."  See Evans, 645 F.3d at 662.

### a.      Procedural Due Process

McCormick, as with all prisoners, is "not completely deprived of the protections of the Due Process Clause simply because [he is a] prisoner[]."  See id.; see also Sandin v. Conner, 515 U.S. 472, 485 (1995) (explaining that although prisoners "do not shed all constitutional rights at the prison gate, lawful incarceration 'brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system'" (internal citation omitted) (quoting Jones v. N.C. Prisoners' Labor Union, Inc., 433 U.S. 119, 125 (1977))).  Thus, "[p]rocedural protections must be afforded to [prisoners] before they are stripped of the rights they still retain while incarcerated."  See Evans, 645 F.3d at 662–63 (citation omitted).

There are two (2) scenarios in which a prisoner holds a liberty interest triggering due process protections:

> when "state statutes and regulations create a liberty interest in freedom from restraint that imposes an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," and (2) when "severe changes in conditions of confinement amount to a grievous loss that should not be imposed without the opportunity for notice and an adequate hearing."

See Evans, 645 F.3d at 663 (quoting Renchenski v. Williams, 622 F.3d 315, 325 (3d Cir. 2010)). These two (2) scenarios are characterized as a "'so-called state-created liberty interest'" and a "'so-called independent due process liberty interest,'" respectively.  See id. (quoting Renchenski, 622 F.3d at 325).

With respect to independent due process liberty interests, "[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon [them] and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight."  See Montanye v. Haymes, 427 U.S. 236, 242 (1976).  Thus, an independent due process liberty interest arises only "when severe changes in conditions of confinement amount to a grievous loss that should not be imposed without the opportunity for notice and an adequate hearing."  See Renchenski, 622 F.3d at 325.  Examples of such severe changes in conditions of confinement include, inter alia, "forced administration of antipsychotic medication, Washington v. Harper, 494 U.S. 210, 221–22 (1990), or involuntary transfer to a mental hospital, Vitek v. Jones, 445 U.S. 480, 492 (1980), or, for a prisoner not convicted of a sex offense, forced participation in sex-offender therapy, Renchenski, 622 F.3d at 326."  See Evans, 645 F.3d at 665 (first two citations altered from original).

10

State-created liberty interests are "generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, . . . nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." See Sandin, 515 U.S. at 484 (internal citations omitted); Wilkinson v. Austin, 545 U.S. 209, 223 (2005) (stating that, "[a]fter Sandin, it is clear that the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves 'in relation to the ordinary incidents of prison life'" (quoting Sandin, 515 U.S. at 484)); Williams v. Sec'y Pa. Dep't of Corr., 848 F.3d 549, 559 (3d Cir. 2017) (explaining that, "in the conditions of confinement context," the liberty interest must be "substantial": "the right alleged must confer freedom from restraint which imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" (internal quotations omitted)).  A two (2)-factor inquiry informs whether prison conditions impose "atypical and significant hardship": "(1) the duration of the challenged conditions; and (2) whether the conditions overall imposed a significant hardship in relation to the ordinary incidents of prison life."  See Williams, 848 F.3d at 560 (citing Shoats v. Horn, 213 F.3d 140, 144 (3d Cir. 2000)).  Additionally, when determining whether a state-created liberty interest exists, courts are not to "compare the prisoner's own life before and after the deprivation."  See Powell v. Weiss, 757 F.3d 338, 344 (3d Cir. 2014).  Instead, "[t]he baseline for determining what is atypical and significant—the ordinary incidents of prison life—is ascertained by what a sentenced inmate may reasonably expect to encounter as a result of his or her conviction in accordance with due process of law."  See id. (citations and internal quotation marks omitted).

Here, the precise nature of McCormick's possible procedural due-process claims is unclear. As far as the Court can discern, McCormick bases these claims on three events: (1) his transfer to a quarantine cell following his expression of suicidal ideation; (2) his transfers to six different Pennsylvania correctional institutions after he attempted suicide on June 27, 2023; and (3) his inability to complete the DOC's grievance process due to his repeated transfers. Presuming that these events form the bases for his procedural due process claims, McCormick fails to state a plausible due-process claim in his complaint.

Starting with his transfer to a quarantine cell following his expression of an intent to commit suicide, the Court notes that McCormick appears to have sought his transfer into a cell with a camera so prison officials could observe him and ensure his safety. See (Doc. No. 1 at 4). Even if McCormick did not desire to be moved to a protective cell, he has not identified a liberty interest relating to this transfer which implicates due-process protections. See, e.g., Williams v. Sorber, No. 24-2046, 2025 WL 1419716, at *3 (3d Cir. May 16, 2025) (unpublished) (concluding that prisoner-plaintiff "failed to state a procedural due process claim based on his transfer to the quarantine unit" at SCI Phoenix during the COVID-19 pandemic, where the plaintiff remained from August 2021 until April 2022, because "[i]t is well settled that a prisoner does not have a protected right to be placed in the cell or unit of [their] choice" and "months-long stays in restrictive confinement did not implicate a liberty interest" (citations omitted)). Moreover, to the extent that McCormick complains about his placement in a restrictive cell for one night, courts have found similar and much greater deprivations insufficient to establish an atypical and significant hardship on an inmate. See, e.g., Smith v. Mensinger, 293 F.3d 641, 654 (3d Cir. 2002) (holding that placement in disciplinary confinement for seven (7) months "does not, on its own, violate a protected liberty interest as defined in Sandin"); Griffin v. Vaughn, 112

12

F.3d 703, 708 (3d Cir. 1997) (determining that placement in administrative custody without a due process hearing for fifteen (15) months was not an atypical and significant hardship). Thus, McCormick's very brief period in restrictive custody in an observation cell was not so atypical and harsh in relation to the ordinary incidents of prison life to constitute a deprivation of a protected liberty interest.

Even if McCormick had a protectable liberty interest at stake here, he received constitutionally sufficient process relating to his placement in an observation cell. He admits that he was expressing suicidal ideation, so his transfer to a cell for observation was reasonably related to a legitimate penological interest of protecting his health and safety.

As for his transfers to six different Pennsylvania state prisons, these events could not trigger a due process violation because a prisoner has no constitutional right to be confined in a particular place. See McKune v. Lile, 536 U.S. 24, 39 (2002) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise."); Sandin, 515 U.S. at 478 ("[T]he Due Process Clause did not itself create a liberty interest in prisoners to be free from intrastate prison transfers."); Meachum v. Fano, 427 U.S. 215, 224 (1976) ("The conviction has sufficiently extinguished the defendant's liberty interest to empower the State to confine him in any of its prisons."). Similarly, McCormick's allegations of interference with his use of the DOC's grievance system fails to state a plausible procedural due process claim.

Undoubtedly, prisoners have a constitutional right to seek redress of grievances as part of their First and Fourteenth Amendment rights of access to courts. See Monroe v. Beard, 536 F.3d 198, 205 (3d Cir. 2008) ("Under the First and Fourteenth Amendments, prisoners retain a right of access to the courts."); Jutrowski v. Twp. of Riverdale, 904 F.3d 280, 294 n.17 (3d Cir. 2018) (explaining that, typically, in the prisoner context, the right is "framed as a due process right"

(citations omitted)). However, "this right is not compromised by [prison officials' failure] to address these grievances." See Booth v. King, 346 F. Supp. 2d 751, 761 (E.D. Pa. 2004); see also Flick v. Alba, 932 F.2d 728, 729 (8th Cir. 1991) (per curiam) ("When the claim underlying the administrative grievance involves a constitutional right, the prisoner's right to petition the government for redress is the right of access to the courts, which is not compromised by the prison's refusal to entertain [their] grievance."). "Access to prison grievance procedures is not a constitutionally[]mandated right, and allegations of improprieties in the handling of grievances do not state a cognizable claim under [Section] 1983." Glenn v. DelBalso, 599 F. App'x 457, 459 (3d Cir. 2015) (unpublished); see Burnside v. Moser, 138 F. App'x 414, 416 (3d Cir. 2005) (unpublished) (affirming that "[i]nmates do not have a constitutionally protected right to the prison grievance process"). In addition, the existence of a grievance procedure "does not confer any substantive constitutional right upon prison inmates." See Hoover v. Watson, 886 F. Supp. 410, 418–19 (D. Del.) (quoting Brown v. Dodson, 863 F. Supp. 284, 285 (W.D. Va. 1994)), aff'd, 74 F.3d 1226 (3d Cir. 1995). Moreover, "[t]he failure of a prison official to provide a favorable response to an inmate grievance is not a federal constitutional violation." See Okey v. Strebig, 531 F. App'x 212, 215 (3d Cir. 2013) (unpublished) (citing Flanagan v. Shively, 783 F. Supp. 922, 931–32 (M.D. Pa.), aff'd, 980 F.2d 722 (3d Cir. 1992)). Therefore, McCormick cannot maintain a procedural-due-process claim relating to any potential interference with his filing or the processing of his grievances. Overall, McCormick fails to state a plausible procedural-due-process claim based on the factual allegations in his complaint.

**b.    Substantive Due Process**

As for McCormick's potential substantive-due-process claims, the Court recognizes that "the Due Process Clause contains a substantive component that bars certain arbitrary, wrongful

government actions regardless of the fairness of the procedures used to implement them."  See Foucha v. Louisiana, 504 U.S. 71, 80 (1992).  To plead a plausible substantive-due-process claim, a plaintiff must include sufficient allegations establishing "that the particular interest at issue is protected by the substantive due process clause, and that the government's deprivation of that protected interest shocks the conscience."  See Kane v. Barger, 902 F.3d 185, 192 (3d Cir. 2018) (citations and internal quotation marks omitted); see also Lewis, 523 U.S. at 847 (explaining that plaintiff asserting substantive due process claim must allege conduct that is "arbitrary[] or conscious shocking").  "This standard's stringency reflects maintenance of the proper proportions of constitutional, as opposed to ordinary tort, violations."  Blain v. Twp. of Radnor, 167 F. App'x 330, 333 (3d Cir. 2006) (unpublished) (citing Lewis, 523 U.S. at 847 n.8).

In this case, McCormick fails to state plausible substantive-due-process claims for two reasons.  First, and as explained above, he does not identify a protected interest at stake.  See Wilkinson, 545 U.S. at 221.  Second, to the extent that McCormick asserts substantive-due-process claims based on his placement in the observation cell, the use of OC spray on him, the placement of the noose in the observation cell, CO Burton's statement to him about killing himself, or retaliation against him, these claims fail because of the "more-specific-provision rule," which provides that "if a constitutional claim is covered by a specific constitutional provision, . . . the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."  See Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 260 (3d Cir. 2010) (quoting United States v. Lanier, 520 U.S. 259, 272 n.7 (1997)).  These claims are specifically covered by the First Amendment and Eighth Amendments; as such, McCormick cannot maintain separate substantive-due-process claims

15

based on this alleged conduct.  Accordingly, the Court will also dismiss McCormick's substantive due process claims against Defendants.

### 3.    Section 1983 Claims Against Rivello

McCormick asserts Section 1983 claims against Rivello, the Superintendent of SCI Huntingdon.  For McCormick to plausibly plead Section 1983 liability for a supervisory official such as Rivello, his factual allegations must satisfy one of two theories of supervisory liability: first, "[i]ndividual defendants who are policymakers may be liable under § 1983 if it is shown that such defendants, with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm[;]" and second, "a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations."  See A.M. ex rel. J.M.K. v. Luzerne County Juv. Det. Ctr., 372 F.3d 572, 586 (3d Cir. 2004) (citation omitted); Barkes v. First Corr. Med., Inc., 766 F.3d 307, 316 (3d Cir. 2014) (explaining requirements for supervisory liability in section 1983 claim and describing "two general ways in which a supervisor-defendant may be liable for unconstitutional acts undertaken by subordinates"), rev'd on other grounds sub nom. Taylor v. Barkes, 575 U.S. 822 (2015).

To allege a plausible claim for supervisory liability under the first theory—the policy-and-practice strand of supervisory liability—a plaintiff must

> (1) identify the specific supervisory practice or procedure that the supervisor failed to employ, and show that (2) the existing custom and practice without the identified, absent custom or procedure created an unreasonable risk of the ultimate injury, (3) the supervisor was aware that this unreasonable risk existed, (4) the supervisor was indifferent to the risk; and (5) the underling's violation resulted from the supervisor's failure to employ that supervisory practice or procedure. Put another way, the inmate must identify the supervisor's specific acts or omissions

16

demonstrating the supervisor's deliberate indifference to the inmate's risk of injury and must establish a link between the supervisor, the act, and the injury.

See Chavarriaga v. N.J. Dep't of Corr., 806 F.3d 210, 227 (3d Cir. 2015) (quoting Brown v. Muhlenberg Twp., 269 F.3d 205, 216 (3d Cir. 2001)).  For the second theory of supervisory liability—participating in, directing others to, or knowledge and acquiescence of constitutional violation—generalized allegations that a supervisory defendant is "in charge of" or "responsible for" an office or facility are insufficient to allege personal involvement in an underlying constitutional violation.  See Saisi v. Murray, 822 F. App'x 47, 48 (3d Cir. 2020) (unpublished) ("Saisi asserted that some defendants were in charge of agencies that allowed this to happen, and that liability stemmed merely from defendants' 'belief' that their conduct would be 'tolerated.' However, a director cannot be held liable 'simply because of [their] position as the head of the [agency].'" (quoting Evancho v. Fisher, 423 F.3d 347, 354 (3d Cir. 2005))); Zigler v. Warren, No. 21-cv-19474, 2022 WL 903383, at *2 (D.N.J. Mar. 28, 2022) ("In simpler terms, a supervisor is not liable for the unconstitutional conduct of [their] employees solely because [they are] a supervisor.").  Additionally, "[a]lthough a court can infer that a defendant had contemporaneous knowledge of wrongful conduct from the circumstances surrounding a case, the knowledge must be actual, not constructive."  See Chavarriaga, 806 F.3d at 222 (citing Baker v. Monroe Twp., 50 F.3d 1186, 1194 (3d Cir. 1995); Rode v. Dellarciprete, 845 F.2d 1195, 1201 n.6 (3d Cir. 1988)).

In this case, McCormick does not attempt to hold Rivello liable under Section 1983 based on the first theory of supervisory liability, i.e., a policy or practice, because he has not averred any facts about any policy or practice Rivello employed at SCI Huntingdon that led to a violation of his constitutional rights.  Instead, McCormick appears to focus solely on Rivello's position as superintendent, as well as Rivello's alleged statements to McCormick that (1) the correctional

officers "d[id] their jobs," and (2) McCormick "was going to be sick of how many prisons [he] end[s] up in." See (Doc. No. 1 at 5). Neither Rivello's position as superintendent, McCormick making him aware about what allegedly occurred, nor Rivello's alleged statements are sufficient to show Rivello's personal involvement in any constitutional violation.

Rivello cannot be held liable under Section 1983 simply because he was the superintendent at SCI Huntingdon on June 27–28, 2023. Liability under Section 1983 cannot be predicated on respondeat superior. See Chavarriaga, 806 F.3d at 227 ("[Plaintiff] cannot predicate liability on her § 1983 claims on a respondeat superior basis." (citing Rode, 845 F.2d at 1207) (emphasis omitted)). In addition, McCormick reporting to Rivello about what allegedly occurred on June 27, 2023, is insufficient to show his personal involvement in any constitutional violation which occurred on that date. See Lawson v. Banta, No. 20-3444, 2022 WL 1772997, at *2 (3d Cir. June 1, 2022) (unpublished) ("[A] defendant's knowledge of a constitutional violation after it occurred is insufficient to show that she personally directed that violation or had actual knowledge of it at the time it occurred." (citing Rode, 845 F.2d at 1208)); King v. Zamiara, 680 F.3d 686, 696–97 (6th Cir. 2012) ("Having the right to control the offending employee is not enough, simply being aware of the misconduct is not enough, and even administrative approval of an action later found to be retaliatory, without more, is not enough."). Furthermore, Rivello's statement about McCormick becoming "sick" of prison transfers is insufficient, see (Doc. No. 1 at 5), without supporting facts showing that Rivello played any role in McCormick's transfer from SCI Huntingdon or any other Pennsylvania correctional facility, to establish a possible constitutional violation. Again, even if Rivello knew that McCormick was going to be transferred, this knowledge does not equate to a constitutional violation. In the end,

McCormick's factual allegations fail to state a plausible Section 1983 claim for supervisory liability against Rivello.[4]

### 4.    Section 1983 Claims Against Lt. Fochtman

As with Rivello, McCormick appears to assert a Section 1983 supervisory liability claim against Lt. Fochtman.  Preliminarily, the Court notes that it is unclear from the allegations in the complaint whether Lt. Fochtman participated in any of the events described in the complaint. Although McCormick identifies Lt. Fochtman as a Defendant in the caption and body of his complaint, see (Doc. No. 1 at 1, 3), his name does not appear anywhere else in the complaint. McCormick's failure to identify Lt. Fochtman by name in his factual allegations warrants dismissing McCormick's Section 1983 claims against him because it does not place Lt. Fochtman on notice of the allegations against him or describe how he was personally involved in the alleged events giving rise to his claims.  See Rode, 845 F.2d at 1207 ("A defendant in a civil rights action must have personal involvement in the alleged wrongs . . . ."); see also Santos v. Berroa, No. 25-cv-06329, 2026 WL 184266, at *6 (E.D. Pa. Jan. 23, 2026) ("[A] complaint must

---

[4]  The Court notes that McCormick, despite complaining about interference with his use of the DOC's mail system and grievance process, attaches various grievance-related documents to his complaint.  See (Doc. No. 1-1).  Among those documents is a Facility Manager's Appeal Response dated January 29, 2025, which Rivello seems to have signed.  See (Doc. No. 1-1 at 10).  To the extent that McCormick complains about Rivello's processing of this appeal, his allegations are insufficient to plausibly plead Rivello's personal involvement in any constitutional violation.  See Reedy v. Evanson, 615 F.3d 197, 231 (3d Cir. 2010) (affirming district court's grant of summary judgement for supervisor who was "kept abreast" of an investigation, but did not direct his subordinate "to take or not to take any particular action"); Murray v. McCoy, No. 23-2582, 2024 WL 1328231, at *3 (3d Cir. Mar. 28, 2024) (unpublished) (explaining that prison superintendent's "awareness of [the plaintiff's] allegations concerning [the defendant correctional officer], without more, is insufficient to establish personal involvement"); Iwanicki v. Pa. Dep't of Corr., 582 F. App'x 75, 79 (3d Cir. 2014) (unpublished) ("[M]ere notification of a grievance does not allege sufficient personal involvement because it does not establish that the Defendants personally directed or acquiesced in the retaliation." (citation omitted)).

provide factual details about what each defendant did, including sufficient information about when, where, and under what circumstances the relevant events took place, to both put the defendants on notice of what they are accused of doing and to support the necessary elements of a claim.").

Despite this pleading deficiency, it is possible that McCormick refers to Lt. Fochtman when he alleges that "[t]he Lt. said that his officers did what they was suppose [sic] to do," see (id. at 5), presumably in response to McCormick complaining about what transpired on June 27, 2023.  Putting aside the fact that McCormick's use of "Lt." to refer to Lt. Fochtman is insufficient because it is reasonably likely that more than one lieutenant worked at SCI Huntingdon on June 27, 2023, this single assertion is insufficient to plausibly allege Lt. Fochtman's liability under Section 1983.  As indicated above, Lt. Fochtman cannot be held liable under Section 1983 simply because he was a supervisory official at SCI Huntingdon on June 27–28, 2023, since liability under Section 1983 cannot be predicated on respondeat superior.  See Chavarriaga, 806 F.3d at 227.  Additionally, McCormick informing Lt. Fochtman about events that allegedly occurred on June 27, 2023, is insufficient to show Lt. Fochtman's personal involvement in any constitutional violation.  See Lawson, 2022 WL 1772997, at *2. Accordingly, the Court will dismiss McCormick's Section 1983 claims against Lt. Fochtman for his failure to state a plausible claim for relief.

### 5.    Section 1983 First Amendment Retaliation Claim

McCormick apparently asserts a First Amendment retaliation claim in his complaint.  See (Doc. No. 1 at 5).  To plead a plausible First Amendment retaliation claim, McCormick must allege that: "(1) his conduct was constitutionally protected; (2) he suffered an adverse action at the hands of prison officials; and (3) his constitutionally protected conduct was a substantial or

motivating factor in the decision to discipline [them]." See Watson v. Rozum, 834 F.3d 417, 422 (3d Cir. 2016) (citations omitted).

As for the first element of a plaintiff's retaliation claim, the filing of lawsuits and prison grievances constitutes activity protected by the First Amendment. See id. (reiterating prior holding that a prisoner-plaintiff engages in constitutionally protected activity when they file a grievance against a prison official (citing Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003))); Smith, 293 F.3d at 653 (acknowledging its prior holding "that falsifying misconduct reports in retaliation for an inmate's resort to legal process is a violation of the First Amendment's guarantee of free access to the courts" (citation omitted)); Allah v. Seiverling, 229 F.3d 220, 223–25 (3d Cir. 2000) (concluding that the prisoner-plaintiff stated a First Amendment retaliation claim where he alleged that he had been kept in administrative segregation in retaliation for filing civil rights claims against prison officials). Regarding the second element of a plaintiff's retaliation claim, an adverse action is one that is "sufficient to deter a person of ordinary firmness from exercising [their] [constitutional] rights[.]" See Mitchell, 318 F.3d at 530 (second alteration in original) (citations and internal quotation marks omitted); Fantone v. Latini, 780 F.3d 184, 191 (3d Cir. 2015), as amended (Mar. 24, 2015) (explaining that an adverse action must be "sufficient to deter a person of ordinary firmness from exercising [their] constitutional rights . . ." (citation omitted)). However, to be actionable under Section 1983, the alleged adverse action must be more than de minimis. See McKee v. Hart, 436 F.3d 165, 170 (3d Cir. 2006) (explaining that the alleged retaliatory conduct "need not be great in order to be actionable, but it must be more than de minimis" (citations and internal quotation marks omitted)).

And, finally, with respect to the third element of a plaintiff's retaliation claim, the Court observes that, "[b]ecause motivation is almost never subject to proof by direct evidence," a plaintiff must typically "rely on circumstantial evidence to prove a retaliatory motive."  See Watson, 834 F.3d at 422.  The plaintiff "can satisfy [their] burden with evidence of either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing that suggests a causal link." See id. (footnote omitted).

In this case, McCormick alleges that he engaged in constitutionally protected activity insofar as he filed grievances or inmate requests to staff pertaining to the events alleged to have occurred on June 27–28, 2023.  See (Doc. Nos. 1 at 5; Doc. No. 1-1).  However, his allegations fail at the second element for a retaliation claim because he does not sufficiently allege any adverse action caused by his filing of grievances.  To the extent that McCormick claims that he was transferred to different Pennsylvania correctional facilities because he filed a grievance or grievances, he does not allege facts that would give rise to a possible constitutional violation insofar as he does not identify the facilities to which he was transferred or how his placement in any of these other facilities adversely affected him.  See Rauser v Horn, 241 F.3d 330, 333 (3d Cir. 2001) (indicating that inmate's transfer to correctional facility where family could not visit could qualify as adverse action); Collazo v. Rozum, 646 F. App'x 274, 276 (3d Cir. 2016) (unpublished) (explaining that inmate had failed to allege "how the prison transfer was an adverse action"); see also Siggers-El v. Barlow, 412 F.3d 693, 702, 704 (6th Cir. 2005) (finding that prison transfer which caused loss of prison job and limited access to plaintiff's attorney could amount to an adverse action); Williams v. Wetzel, No. 17-cv-00079, 2020 WL 583983, at *8 (M.D. Pa. Feb. 6, 2020) (finding that prison transfer was adverse action where it "punitively

detach[ed] Plaintiff from his loved ones and/or visitation" and affected his parole recommendation), aff'd, 827 F. App'x 158 (3d Cir. 2020) (unpublished).  Accordingly, the Court will dismiss McCormick's Section 1983 First Amendment retaliation claim for the failure to state a claim against any Defendant.

### 6.    Section 1983 Claim Against CO Renninger

The Court construes McCormick's complaint as alleging that CO Renninger violated his Eighth Amendment rights by failing to intervene when CO Burton deployed OC spray into McCormick's cell on June 27, 2023.[5]  "To prevail on a failure to intervene claim, a plaintiff must show: (1) that the defendant failed or refused to intervene when a constitutional violation took place in his or her presence or with his or her knowledge; and (2) there was a realistic and reasonable opportunity to intervene."  Balliet v. Luzerne County, No. 22-cv-02032, 2024 WL 2275252, at *8 (M.D. Pa. May 20, 2024) (citations and internal quotation marks omitted). "[T]he duration of the incident is key to determining whether there was a reasonable opportunity [to intervene]."  El v. City of Pittsburgh, 975 F.3d 327, 335 (3d Cir. 2020) (citing Ricks v. Shover, 891 F.3d 468, 479 (3d Cir. 2018)).  If "an incident is momentary, its 'brevity' may 'defeat[] [a] . . . failure to protect claim."  See id. (alterations in original) (quoting Ricks, 891 F.3d at 479).

Here, McCormick fails to include sufficient facts in his complaint to state a plausible failure-to-intervene claim against CO Renninger.  Although McCormick alleges that CO

---

[5]  McCormick does not allege that CO Renninger deployed OC spray, and he does not assert factual allegations that would reasonably infer that CO Renninger knew about, or placed a noose, in McCormick's cell.  His allegations also do not show that CO Renninger was deliberately indifferent to McCormick's suicidal ideations insofar as CO Renninger moved McCormick into the observation cell, which is where McCormick appears to have desired to go, after learning about McCormick's suicidal thoughts.  As such, the Court interprets the complaint as containing only a failure-to-protect claim against CO Renninger.

Renninger came to his cell door along with CO Burton, that CO Burton indicated a desire to spray McCormick with OC spray, and that CO Burton deployed OC spray, he does not state enough details about this incident that would allow this Court to reasonably infer that CO Renninger had a realistic and reasonable opportunity to intervene.  Instead, his allegations lead to a reasonable inference that the deployment of OC spray was momentary and, as such, CO Renninger did not have an opportunity to intervene.  Therefore, the Court will dismiss McCormick's Eighth Amendment failure-to-intervene claim against CO Renninger.

### 7.    Section 1983 Claims Against CO Burton

The Court understands McCormick as asserting Eighth Amendment claims against CO Burton for excessive force based on CO Burton's use of OC spray and deliberate indifference to his serious medical needs insofar as CO Burton, despite knowing of McCormick's suicidal ideation, recklessly disregarded McCormick's vulnerability to suicide and, in fact, encouraged him to commit suicide.  As explained below, the Court will dismiss McCormick's excessive-force claim but permit his vulnerability-to-suicide claim to pass statutory screening.

As for McCormick's excessive-force claim, he must allege facts showing that force was applied "maliciously and sadistically for the very purpose of causing harm."  See Jacobs v. Cumberland County, 8 F.4th 187, 193 (3d Cir. 2021) (quoting Whitley v. Albers, 475 U.S. 312, 320–21 (1986)).  This requires consideration of whether the force was "applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  See Hudson v. McMillian, 503 U.S. 1, 7 (1992).  Several factors inform this analysis, including:

> (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of the injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of facts known to them; and (5) any efforts made to temper the severity of the forceful response.

See Smith, 293 F.3d at 649 (quoting Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000)).

The inquiry into an alleged use of excessive force is driven "by the extent of the force and the circumstances in which it is applied; not by the resulting injuries." See Smith, 293 F.3d at 648. "The use of chemical agents to subdue recalcitrant prisoners is not cruel and unusual when reasonably necessary." Gibson v. Flemming, 837 F. App'x 860, 862 (3d Cir. 2020) (unpublished) (quoting Soto v. Dickey, 744 F.2d 1260, 1270 (7th Cir. 1984)); see also Passmore v. Ianello, 528 F. App'x 144, 147 (3d Cir. 2013) (unpublished) (explaining that the use of chemical agents is not a per se constitutional violation).

In this case, the primary issue with McCormick's excessive force claim is that it is unclear whether he complains about CO Burton's use of OC spray. McCormick admits that at the time CO Burton deployed the OC spray, he had covered his door and was "unresponsive" when the correctional officers knocked on his door twice. See (Doc. No. 1 at 4). Moreover, although McCormick alleges that CO Burton told McCormick that he wanted to spray him because he threatened "Mis [sic] Cousins," which possibly shows malicious intent, he also alleges that the use of the spray "was not a[n] issue." See (id.). This latter allegation appears to indicate that McCormick believes that the use of the OC spray was justified.[6] It is also unclear

---

[6] McCormick attaches to his complaint a misconduct report that appears to be related to the events on June 27, 2023. See (Doc. No. 1-1 at 15). This report states in pertinent part as follows:

> On [June 27, 2023, at approximately 8:25 p.m.,] while conducting 2110 hrs [sic] count this officer stopped at [McCormick's cell,] who [sic] had his cell door completely covered and was unresponsive. This officer gave multiple direct orders to uncover the cell door to which . . . McCormick refused. This officer administered one application of OC [spray] while Officer Renninger made a radio call to G Control.

See (id.).

how much OC spray CO Burton allegedly used and whether the spray reached McCormick. As such, the Court will dismiss McCormick's Eighth Amendment excessive-force claim against CO Burton premised on the use of OC spray.

As for McCormick's Eighth Amendment vulnerability-to-suicide claim, "the vulnerability to suicide framework is simply a more specific application of the general rule set forth in Estelle v. Gamble . . . which requires that prison officials not be deliberately indifferent to the serious medical needs of prisoners." See Palakovic v. Wetzel, 854 F.3d 209, 222 (3d Cir. 2017). Thus, "a 'particular vulnerability to suicide' is just one type of 'serious medical need.'" See id. (quoting Colburn v. Upper Darby Twp., 946 F.2d 1017, 1023 (3d Cir. 1991)).

For a plaintiff to maintain an Eighth Amendment claim that prison officials failed to prevent them from injuring themselves in an attempt to commit suicide, the plaintiff must demonstrate that "(1) [he] had a 'particular vulnerability to suicide,' (2) the custodial officer or officers knew or should have known of that vulnerability, and (3) those officers 'acted with reckless indifference' to [his] particular vulnerability." See Colburn, 946 F.2d at 1023. Moreover, a plaintiff's announcement of an intent to kill themselves indicates a "strong likelihood, rather than a mere possibility, that self-inflicted harm will occur." See id. at 1024 (internal quotation marks omitted).

In this case, McCormick alleges facts that would permit a reasonable inference that CO Burton knew that he was thinking of committing self-harm after arriving at McCormick's cell and then transferring him to an observation cell. See (Doc. No. 1 at 4). McCormick also alleges that before he entered the observation cell, CO Burton told him that he should kill himself. See (id.). He further appears to allege that CO Burton either placed the noose in the observation cell or at least knew that the noose was there before McCormick entered it. See (id.). These

26

allegations, when viewed together, are sufficient at this early stage to state a plausible Eighth Amendment vulnerability-to-suicide claim against CO Burton.

### 8.    Leave to Amend

Having determined that all but McCormick's Eighth Amendment vulnerability-to-suicide claim against CO Burton are subject to dismissal, the Court must determine whether to grant him leave to file an amended complaint as those claims that the Court will dismiss.  Courts should generally give leave to amend but may dismiss a complaint with prejudice where leave to amend would be inequitable or futile.  See Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc., 482 F.3d 247, 252 (3d Cir. 2007) ("[I]n civil rights cases district courts must offer amendment—irrespective of whether it is requested—when dismissing a case for failure to state a claim unless doing so would be inequitable or futile."); see also Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002) ("When a plaintiff does not seek leave to amend a deficient complaint after a defendant moves to dismiss it, the court must inform the plaintiff that [they have] leave to amend within a set period of time, unless amendment would be inequitable or futile.").  "In determining whether [amendment] would be futile, the district court applies the same standard of legal sufficiency as [it] applies under Fed. R. Civ. P. 12(b)(6)."  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997).

Here, McCormick cannot assert a plausible claim against the DOC because of its Eleventh Amendment immunity, so even though the Court will dismiss McCormick's Section 1983 claims against the DOC without prejudice, see Merritts v. Richards, 62 F.4th 764, 772 (3d Cir. 2023) ("'Eleventh Amendment immunity is a threshold, nonmerits issue[,] . . . a dismissal on that basis, like dismissals for lack of jurisdiction, should normally be without prejudice."), the Court will not allow him to file an amended complaint in which he asserts Section 1983 claims

against the DOC. However, as to his other claims in the complaint that the Court will dismiss—his First Amendment retaliation claim, Eighth Amendment failure-to-intervene claim against CO Renninger, Eighth Amendment excessive-force claim against CO Burton, and his supervisory-liability claims against Rivello and Lt. Fochtman, the Court cannot definitively conclude at this stage that filing an amended complaint as to these claims would be futile. Therefore, the Court will grant McCormick leave to file an amended complaint as to these claims if he so chooses. If McCormick decides not to file an amended complaint in accordance with the Order accompanying this Memorandum, this case will proceed on only his Eighth Amendment vulnerability-to-suicide claim against CO Burton.

### C.    McCormick's Motion to Appoint Counsel

McCormick moves for the appointment of counsel in this matter. (Doc. No. 10.) The Court will deny this motion without prejudice.

As a civil litigant, McCormick has no constitutional or statutory right to the appointment of counsel; nevertheless, district courts have broad discretionary power to request appointed counsel for such litigants who cannot afford counsel. See 28 U.S.C. § 1915(e)(1) ("The court may request an attorney to represent any person unable to afford counsel."); Montgomery v. Pinchak, 294 F.3d 492, 498 (3d Cir. 2002) (citations omitted). District courts follow a two (2)-step process when deciding whether to request appointed counsel to represent an indigent civil litigant. See Houser v. Folino, 927 F.3d 693, 697 (3d Cir. 2019). First, as a threshold inquiry, the court must consider whether McCormick's case has some arguable merit in fact and law. See Montgomery, 294 F.3d at 498–99 (citations omitted). Second, if the Court determines that McCormick's case has some arguable merit in fact and law, then the court is to consider other factors, including: (1) his ability to present their own case; (2) the complexity of the legal issues;

28

(3) the degree to which factual investigation will be required and his ability to pursue such an investigation; (4) the extent to which the case is likely to turn on credibility determinations; (5) whether expert testimony will be required; and (6) whether he can retain and afford counsel.  See Houser, 927 F.3d at 697 (citations omitted).  This list, however, "is not meant to be exhaustive." See Tabron v. Grace, 6 F.3d 147, 157 (3d Cir. 1993); see also Houser, 927 F.3d at 700 (stating that "[w]e have always emphasized that [these] factors are only a guidepost for district courts in their exercise of the broad statutory discretion granted to them by Congress[,]" and that "[t]hey are not exhaustive, nor are they each always essential").  Rather, the court must determine on a case-by-case basis whether a request for appointed counsel is warranted.  See Tabron, 6 F.3d at 157–58.

As noted above, the threshold question relating to McCormick's motion for appointment of counsel is whether his claims have "some arguable merit in fact and law."  See Montgomery, 294 F.3d at 498–99.  The Court has screened the complaint and determined that McCormick has stated a plausible claim as to only his Eighth Amendment vulnerability-to-suicide claim against CO Burton.  Nevertheless, there is nothing about this specific claim that would warrant the Court appointing counsel to represent McCormick at this time.  McCormick has shown the ability to present this claim, the legal issues pertaining to the claim are not complex, an extensive factual investigation is not required, and it does not appear that expert testimony will be required.  Additionally, although it appears that McCormick is unable to afford private counsel and there could be credibility determinations pertaining to the events of June 27, 2023, the Court finds that

the factors, on balance, do not support appointing counsel for McCormick at this time. Therefore, the Court will deny his motion to appoint counsel.[7]

## IV.    CONCLUSION

For the reasons stated above, the Court will grant McCormick's IFP Application, deny his motion to appoint counsel without prejudice, dismiss his complaint as to all claims other than his Section 1983 Eighth Amendment vulnerability-to-suicide claim against CO Burton, and permit him to file an amended complaint as to his Section 1983 claims other than his claims against the DOC.  Should McCormick decide not to file an amended complaint, this case will proceed on only his Section 1983 Eighth Amendment vulnerability-to-suicide claim against CO Burton.  An appropriate Order follows.[8]

s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania

---

[7] This denial will be without prejudice.  See Tabron, 6 F.3d at 156–57 ("[A]ppointment of counsel under § 1915(d) may be made at any point in the litigation and may be made by the district court sua sponte . . . even if it does not appear until trial (or immediately before trial) that an indigent litigant is not capable of trying his or her case, the district court should consider appointment of counsel at that point.").  If future proceedings demonstrate the need for counsel, the matter of whether counsel should be appointed may be reconsidered either sua sponte or upon McCormick's motion.

[8] This Order will provide McCormick with additional instructions on the filing of an amended complaint.